## AFFIDAVIT OF ERIKA T. BROADHURST

I, Erika T. Broadhurst, being first duly sworn, depose and state as follows:

## BACKGROUND OF AFFIANT

1.      I am a Special Agent for the U.S. Department of Health and Human Services,

Office of Inspector General (HHS-OIG), currently assigned to the Boston Regional Office in

Boston, Massachusetts.  I have been employed as a Special Agent for HHS-OIG since March

2007.  Before becoming a Special Agent, I was an analyst with HHS-OIG for more than five

years.

2.      In March 2007 I completed the Criminal Investigator Training Program at the

Federal Law Enforcement Training Center (FLETC) and the Inspector General Academy at

FLETC.  In June 2007, I completed the Special Agent Basic Training Program at FLETC.  In

2001 I received a Bachelor's Degree in Business Administration with a concentration in Health

Systems Management from the University of Connecticut.  In 2006, I received a Master's Degree

in Public Health from Boston University.  As a Special Agent with HHS-OIG I have investigated

numerous allegations of fraud involving programs administered by the U.S. Department of

Health and Human Services.  I have also participated in the execution of numerous search

warrants related to allegations of health care fraud.

3.      I am currently assigned to the HHS-OIG Office of Investigations, Boston

Regional Office.  As a Special Agent with HHS-OIG, I am responsible for investigating

allegations of health care fraud occurring in government-sponsored health care benefit programs

such as Medicare and Medicaid, and for investigating violations of Federal statutes by

individuals or entities that affect HHS programs, providers, grantees, contractors and/or

employees.  As a result of these investigations, I have reviewed and analyzed Medicare and

Medicaid claims data pertaining to outpatient office visits and prescription claims. Outpatient claims are associated with the Medicare Part B program and prescription claims are associated with the Medicare Part D program. I have participated in numerous such investigations and have assisted in the execution of search and arrest warrants. I have also participated in numerous witness and subject interviews.

4.      My health care fraud experience also includes investigating beneficiaries who are involved in drug diversion, many of whom engage in drug seeking behavior. Based on my training and experience, many of the more popular opiates, such as OxyContin, Oxycodone, and Buprenorphine-Naloxone (Suboxone), are frequently abused by drug addicts and are highly addictive. In addition, based on my training and experience, many drug- seeking patients also try to obtain prescriptions for stimulants such as Adderall and Ritalin.

5.      Along with Special Agents from the Federal Bureau of Investigation (FBI), Drug Diversion Investigators from the Drug Enforcement Administration (DEA), Detectives from Manchester, NH Police Department, and Officers from the New Hampshire State Police, I am conducting an investigation into potential violations of 18 U.S.C. § 1347 (Health Care Fraud) and 21 U.S.C. § 843(a)(3) (obtaining a controlled substance by fraud, forgery, etc.) (collectively, the "Target Offenses"), by JANE MASTROGIOVANNI.

6.      The information set forth in this affidavit is based on my personal participation in this investigation, as well as my training and experience, information received from other law enforcement officers, including their direct examination of relevant documents, reports of interviews with witnesses in this investigation, electronic surveillance, and physical surveillance conducted in connection with persons and places mentioned in this affidavit. I have not set forth every detail I or other law enforcement agents know about this investigation, but have simply set

2

forth facts that I believe are sufficient to establish probable cause for the issuance of the requested warrant.

7.      I submit this affidavit in support of an application for a search warrant under Rule 41 of the Federal Rules of Criminal Procedure in an ongoing federal criminal investigation into JANE MASTROGIOVANNI authorizing search of her Apple iPhone model A1660 cellular phone, bearing FCC ID BCG-E3085A, hereinafter the "Device."  As further described in **Attachment A**, the Device was taken into custody of the HHS-OIG  on May 10, 2018 and is currently being held in evidence in the secure evidence room of the U.S. Attorney's Office at 53 Pleasant Street, Concord, NH.   The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in **Attachment B**.

## STATUTORY AUTHORITY

8.      Title 21, United States Code, Section 843(a)(3) prohibits, *inter alia*, the acquiring or obtaining "possession of a controlled substance by misrepresentation, fraud, forgery, deception or subterfuge."

9.      Title 18, United States Code, Section 1347 prohibits any person from knowingly and willfully executing, or attempting to execute, a scheme or artifice (1) to defraud any health care benefit program, or (2) to obtain, by means of materially false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of any health care benefit program, in connection with the delivery or payment for health care benefits, items or services.

10.      The drugs and other substances that are considered controlled substances under the Controlled Substances Act are divided into five schedules.

a.  Schedule I:  Substances in this schedule have no currently accepted medical use in treatment in the United States (i.e. Heroin)

b.  Schedule II:  Substances in this schedule have a high potential for abuse with severe psychological or physical dependence (i.e. oxycodone, hydromorphone, fentanyl)

c.  Schedule III: Substances in this schedule have a potential for abuse less than substances in Schedule I and II (i.e. Buprenorphine-Naloxone (Suboxone))

d.  Schedule IV:  Substances in this schedule have a potential for abuse less than substances in Schedule III (i.e. alprazolam, clonazepam)

e.  Schedule V:  Substances in this schedule have a potential for abuse less than substances in Schedule IV (i.e. Robitussin AC)

## REGULATORY BACKGROUND

11.     Medicare is the government medical assistance program that provides funds to pay for medical services for those age 65 and older, as well as for certain individuals with disabilities ("beneficiaries").  Medicaid is a federally subsidized health insurance program under Title XIX of the Social Security Act, which pays for medical assistance for certain individuals and families with low incomes and resources.  This program became law in 1965 as a cooperative venture jointly funded by the federal and state governments (including the District of Columbia and the Territories) to assist states in providing medical assistance to eligible individuals.  On average, states are reimbursed approximately 50% of the cost from the federal government.  The Medicaid program and Medicare are "health care benefit programs" within the meaning of 18 U.S.C. § 24(b), and hence, 18 U.S.C. § 1347, in that they are public plans, affecting commerce, under which a medical benefit, item, or service is paid for certain

individuals.  Medicare and Medicaid are administered by the Centers for Medicare and Medicaid

Services ("CMS"), a federal agency under the U.S. Department of Health and Human Services.

Medicare includes Part D, as explained in greater detail below.

<u>Medicare Part D</u>

12.     Medicare Part D is a prescription drug benefit program that was created through

the U.S. Medicare Prescription Drug, Improvement, and Modernization Act of 2003.  Part D

drugs are defined in Title XVIII of the Social Security Act and in the regulations of 42 CFR

423.100.  Under the Medicare Part D program, CMS makes payments to Medicare Prescription

Drug Plans on a monthly basis through estimated subsidy payments.  Each time a Medicare

beneficiary (i.e., patient) fills a prescription under Medicare Part D, a plan sponsor must submit a

summary record called the prescription drug event (PDE) record to CMS.  A Part D drug may be

dispensed upon a prescription if it is being used for a medically accepted indication.

## INVESTIGATION BACKGROUND

### A.  FALSE PRESCRIPTIONS FROM DR. KATRAGADDA

13.     In March 2018, the New Hampshire State Police Drug Diversion Unit received a

call from a Pharmacist at CVS PHARMACY in Manchester, NH that JANE

MASTROGIOVANNI (J. MASTROGIOVANNI) came in to fill a controlled substances

prescription early before the prescription could be refilled.  CVS PHARMACY called the

prescribing Physician, Dr. Sreenivas Katragadda (Dr. Katragadda) to verify the prescription and

Dr. Katragadda told the pharmacist that he had not treated or prescribed to J.

MASTROGIOVANNI <u>since 2016</u>.

14.     Dr. Katragadda is a Psychiatrist in Manchester, NH.  Agents interviewed Dr.

Katragadda on April 11, 2018.  Dr. Katragadda said he stopped treating J. MASTROGIOVANNI

on an outpatient basis in June 2016.  The last legitimate prescriptions Dr. Katragadda wrote for J. MASTROGIOVANNI were dated June 7, 2016.  Dr. Katragadda said any prescriptions written after that date in his name are not legitimate.

15.   Based on a review of prescriptions records, from June 8, 2016 and until March 8, 2018, J. MASTROGIOVANNI received approximately fifty-six fraudulent prescriptions forged or misrepresented as having been written by Dr. Katragadda.  These fraudulent prescriptions were all created with Dr. Katragadda's name and DEA license number, # FK0307505.  They were filled at three different pharmacies in Manchester, NH:

    a.  Fifteen computerized prescriptions for controlled substances were filled at the RITE AID PHARMACY, store #10278, located at 270 Mammoth Road, Manchester, NH.  The prescriptions were for the following controlled substances:  1 prescription for Amphetamine Salts 30 mg (Adderall), 9 prescriptions for Buprenorphine-Naloxone 8-2mg. (Suboxone), 4 prescriptions for Dextroamphetamine 30mg, and 1 prescription for Methylphenidate (Ritalin) 20mg.  Medicare Part D paid for all fifteen fraudulent prescriptions.

    b.  Fifteen computerized prescriptions were filled at CVS PHARMACY, store #200, 788 South Willow Street, Manchester, NH.  The prescriptions were for the following controlled substances: 8 prescriptions for Buprenorphine-Naloxone 8-2mg. (Suboxone), 6 prescriptions for Methylphenidate (Ritalin) 20-36mg, 1 prescription for Amphetamine Salts 30 mg (Adderall).  Medicare Part D paid for six out of the fifteen prescriptions.

    c.  Twenty-six computerized prescriptions were filled at CVS PHARMACY, store #2257, located at 271 Mammoth Rd Manchester, NH.  The prescriptions were for the following controlled substances:  1 prescription for Dextroamphetamine 30mg, 15 prescriptions for Methylphenidate (Ritalin) 20 mg, 2 prescriptions for Buprenorphine-Naloxone 8-2mg. (Suboxone), and 8 prescriptions for Amphetamine Salts 30 mg (Adderall). Medicare Part D paid for the fraudulent prescriptions.

16.    The 56 fraudulent prescriptions for controlled substances that were filled at CVS #200, Manchester, NH, CVS #2257, Manchester NH, and  Rite Aid #10278, Manchester, NH contain the following patient identifying information:

Patient:  Jane Mastrogiovanni
DOB: ▮▮▮▮▮▮
Address: ▮▮▮▮▮▮▮▮▮▮▮▮▮
Phone: ▮▮▮▮6831

17.    Copies of all of the 56 fraudulent prescriptions regarding Dr. Katragadda have been obtained from CVS Pharmacy and Rite Aid Pharmacy.  The prescriptions reveal Dr. Katragadda's name is misspelled.  The name on the prescriptions appears as "Dr. Kattragada" (including an extra "t" and only one "d").  Adderall is also misspelled, appearing as "Adderal" on at least some of the forged prescriptions.

18.    The pharmacist at CVS said J. MASTROGIOVANNI would often use the drive-thru pharmacy lane at the store right before closing time around 11:50 PM to drop off her prescriptions.  Based on my knowledge, training, experience, and information provided to me by other agents, individuals seeking to pass off fraudulent prescriptions will often undertake these measures to ensure less vigorous scrutiny of the prescription before it is filled.

19.     CVS and Rite Aid records indicate that J. MASTROGIOVANNI also filled numerous non-controlled substances purportedly issued by Dr. Katragadda after June 7, 2016 that therefore appear to be fraudulent.  Medicare Part D also paid for the fraudulent prescriptions for non-controlled substances.

20.     A criminal records check revealed that J. MASTROGIOVANNI was previously arrested in December 2011 for false prescriptions; she pled guilty to the charge on October 26, 2012.  Her husband, David Mastrogiovanni, was also arrested in December 2011 for false prescriptions; he pled guilty to the charge on March 12, 2012.

**B.  FALSE PRESCRIPTIONS FROM NURSE PRACTITIONER  JOHNSON**

21.     In addition to the fraudulent prescriptions obtained in Dr. Katragadda's name, we have identified additional numerous prescriptions for non-controlled substances from other prescribers that appear to be fraudulent.

22.     Diana Johnson (JOHNSON) is a Nurse Practitioner who worked at Manchester Community Health Center (MCHC) until January 9, 2017.  JOHNSON was interviewed on May 3, 2018.  JOHNSON said that she treated J. MASTROGIOVANNI while she was employed at MCHC, but not after.   During the interview, JOHNSON was shown a January 29, 2018 prescription for Ciprofloxacin HCL for 20, 500mg tablets that J. MASTROGIOVANNI had filled.   Nurse Johnson stated that she did not issue this prescription and immediately noted several errors on it: (1) the prescription referred to JOHNSON as a "PA-C" or physician's assistant, when she is in fact a nurse practitioner and (2) the prescription showed JOHNSON as working at MCHC, which she had not done for more than a year at the time the prescription was made.

23.     Additional records were obtained from MCHC indicating that J. MASTROGIOVANNI had stopped being a patient there in May 2016.  After May 11, 2016, there were twenty-seven computerized prescriptions for non-controlled medications that were fraudulently created with Diana Johnson's name and the address of Manchester Community Health Center, 145 Hollis Street, Manchester, NH.  All of the prescriptions were filled at CVS PHARMACY Store #2257, located 271 Mammoth Rd Manchester, NH.  Medicare Part D paid for the fraudulent prescriptions.  The prescriptions were for:   Lisinopril, Escitalopram Oxalate, Ciprofloxacin HCL, Clindamycin HCL, Ondansetron HCL, Fluticasone Propionate, and Cefuroxime Axetil.  The fraudulent prescriptions contain the following information:



Patient:  Jane Mastrogiovanni
DOB:
Address:
Phone:                -6831

24.     On April 18, 2018, J. MASTROGIOVANNI called CVS PHARMACY #200 and left two phone messages on the CVS voicemail system.  J. MASTROGIOVANNI was calling because her prescriptions that she dropped off for Lisinopril and Ciprofloxacin, purportedly written by JOHNSON, were not being filled by CVS until they verified the prescriptions with JOHNSON.  In the first message at 11:04 PM J. MASTROGIOVANNI said there were "No reasons for those prescriptions to be held or to call my provider…these are not old prescriptions they are new prescriptions."  J. MASTROGIOVANNI called again at 11:14 PM and left another message in which she said she "went to her provider on April 16, 2018…this is a brand new prescription…I'm not playing games."  On April 19, 2018, J. MASTROGIOVANNI called the CVS voicemail and left a message at 9:49 PM in which she said "The prescription wasn't old, it was written this week by my provider…there is no reason for you not to fill it…I am done with

CVS." The prescriptions were never filled and CVS called the New Hampshire State Police. (The CVS voicemail system apparently cannot identify the phone number utilized by the caller.)

### C.  JENNIFER STANIOSKI

25.     Our investigation has revealed to date that Jennifer Stanioski (J. STANIOSKI) is J. MASTROGIOVANNI'S niece.  J. STANIOSKI occasionally picked-up fraudulent prescriptions written for J. MASTROGIOVANNI at CVS PHARMACY and RITE AID PHARMACY.  J. STANIOSKI has a criminal history of drug offenses and in March 2018 called in her own prescriptions to CVS PHARMACY #200 for Clonazepam and Adderall.  The pharmacy declined to fill these prescriptions.

26.     Also in March 2018 STANIOSKI called in prescriptions to CVS PHARMACY #2257 for Clonazepam, Xanax and Gabapentin under the name of "Miss Stevens" calling from Physician Assistant Jeremy Orr at Catholic Medical Center Emergency Department. After calling the provider, CVS PHARMACY determined these were fraudulent prescriptions. The Clonazepam was filled nonetheless on March 7, 2018. The other prescriptions were not filled and CVS PHARMACY called the Manchester, NH police department.  J.STANIOSKI dropped off a hardcopy prescription to RITE AID PHARMACY # 10278 for Adderall under Physician Assistant Jeremy Orr's name that was written for J. STANIOSKI.  There were three errors on the prescriptions:  The DEA number for Jeremy Orr was missing a digit on the prescription.  The fraudulent prescription lists the DEA number as MO569840 when it should be MO0569540. The DEA number used on the fraudulent prescription is for Vermont not New Hampshire.  On the fraudulent prescription Adderall is misspelled as "Adderal," which is the same misspelling on the fraudulent prescriptions that J. MASTROGIOVANNI used to fill prescriptions.

27.     Most recently, Stanioski was arrested by the Malden, MA police on November 11, 2017 for shoplifting.  She was also charged with the possession of a class B controlled substance.  Stanioski was found with loose Gabapentin pills and a Suboxone strip in her bag with no pill bottles or associated prescriptions for the drugs.  That case is ongoing.  Stanioski was also arrested by the Worcester, MA police on April 20, 2018 for shoplifting.  She was found to have two pill bottles, one for Gabapentin and one for Clonidine, in pill bottles.  The pill bottles were in the name of a "Francisco Garcia."

**D.  Search Warrant at** ████████████ **Manchester, NH**

28.     On May 9, 2018, I obtained a search warrant from the United States District Court for the District of New Hampshire to search the residence of J. MASTROGIOVANNI located at ████████████ Manchester, NH, for evidence related to her fraudulent or false prescriptions and concomitant health care fraud.

29.     On the morning of May 10, 2018, I and several other members of federal, State, and local law enforcement executed the search warrant at ████████████ Manchester, NH.  There, I encountered J. MASTROGIOVANNI's husband, David Mastrogiovanni.  J. MASTROGIOVANNI was not home.  Mr. Mastrogiovanni informed us that J. MASTROGIOVANNI was currently an in-patient at Elliot Hospital in Manchester, NH.

30.     Mr. Mastrogiovanni also confirmed for us that his wife would create false or forged prescriptions in order to obtain controlled and uncontrolled substances.  He specifically told us that he thought his wife used the Device as the primary way she would create and send fake prescriptions to the printer at ████████████ to be later brought to area pharmacies to be filled.  He said she was in possession of the Device at the Hospital.

31.     On the afternoon of May 10, 2018, agents interviewed J. STANIOSKI in

11

Worcester, MA.  J. STANIOSKI said J. MASTROGIOVANNI has been creating fake

prescriptions for a period of four years.  J. STANIOSKI lived with J. MASTROGIOVANNI

from November 2017 until April 2018.  She also said that she saw J. MASTROGIOVANNI use

her Apple iPhone, i.e., the Device, to send the fake prescriptions to the printer located at ▮▮▮▮

▮▮▮▮▮▮▮▮ in Manchester, NH, and later brought the fake prescriptions to area pharmacies to

be filled.

      32.     Evidence seized from the search warrant at ▮▮▮▮▮▮▮ is still being

processed, however, at a minimum I am aware that pill bottles relevant to the fraudulent

prescriptions were seized.

      33.     I and other agents then went to Elliot Hospital in search of J.

MASTROGIOVANNI.  She was in fact at the hospital as an in-patient in the Clinical Decision

Unit.   Agents met with the risk managers from the hospital who informed the nurses treating J.

MASTROGIOVANNI that agents needed to speak with J. MASTROGIOVANNI.  Nurses

treating J. Mastrogiovanni said she was stable and able to speak to agents.  J.

MASTROGIOVANNI was lucid, did not appear in physical distress, and agreed to answer

investigators' questions.  She denied ever passing off any fake prescriptions, contending that all

of her prescriptions were legitimate, including those from Dr. Katragadda.  Based on my review

of the prescriptions and interview with Dr. Katragadda, I know this statement to not be true.  J.

MASTROGIOVANNI did have in her possession the Device, which she admitted was the phone

associated with the phone number on file with the pharmacies above, ▮▮▮▮▮-6831, and on

which she would call pharmacies about her prescriptions.

      34.     I asked J. MASTROGIOVANNI if I could see the phone and if she would consent

to our seizure of it.  J. MASTROGIOVANNI declined to provide us with consent.  Based on our

knowledge about the phone's use in furthering the commission of crimes and the statements from

David Mastrogiovanni, I decided to seize the phone into evidence.  Before seizing the phone I

did offer to J. MASTROGIOVANNI that if she needed to call anyone on the phone before we

seized it that she could do that.  We also confirmed with the Hospital risk manager that she had

access to a phone next to her hospital bed to make calls if she needed to.  I advised J.

MASTROGIOVANNI that the phone was being seized as evidence and that agents would be

applying for a search warrant in order to search the phone, i.e., the Device identified in

Attachment A.   My colleague asked J. MASTROGIOVANNI if she would provide us with the

passcode to access the phone, and she did.  I later placed the device in "Airplane Mode", to

prevent its contents from being remotely deleted.  Our on-site technician also disabled any

password lock to ensure we could later search the phone after obtaining a warrant.

## **TECHNICAL TERMS**

35.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

> a.   **Wireless telephone**:  A wireless telephone (or mobile telephone, or cellular
>
> telephone) is a handheld wireless device used for voice and data communication
>
> through radio signals.  These telephones send signals through networks of
>
> transmitter/receivers, enabling communication with other wireless telephones or
>
> traditional "land line" telephones.  A wireless telephone usually contains a "call
>
> log," which records the telephone number, date, and time of calls made to and
>
> from the phone.  In addition to enabling voice communications, wireless
>
> telephones offer a broad range of capabilities.  These capabilities include: storing
>
> names and phone numbers in electronic "address books;" sending, receiving, and

storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. **Digital camera**:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c. **Portable media player**:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to

store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. **GPS**:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. **PDA**:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer

software, giving them many of the same capabilities as personal computers.  For

example, PDA users can work with word-processing documents, spreadsheets,

and presentations.  PDAs may also include global positioning system ("GPS")

technology for determining the location of the device.

36.     Based on my training, experience, and research, I know that the Device has

capabilities that allow it to serve as a wireless telephone, digital camera, portable media player,

GPS navigation device, and PDA.  In my training and experience, examining data stored on

devices of this type can uncover, among other things, evidence that reveals or suggests who

possessed or used the device as well as communications with other individuals.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

37.     Based on my knowledge, training, and experience, I know that electronic devices

can store information for long periods of time.  Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device.  This information can

sometimes be recovered with forensics tools.

38.     ***Forensic evidence***.  As further described in Attachment B, this application seeks

permission to locate not only electronically stored information that might serve as direct

evidence of the crimes described on the warrant, but also forensic evidence that establishes how

the Device was used, the purpose of its use, who used it, and when.  There is probable cause to

believe that this forensic electronic evidence might be on the Device because:

    a.   Data on the storage medium can provide evidence of a file that was once on the

        storage medium but has since been deleted or edited, or of a deleted portion of a

        file (such as a paragraph that has been deleted from a word processing file).

16

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

39.  ***Nature of examination***.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

17

40.     ***Manner of execution***.   Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto any premises.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## <u>CONCLUSION</u>

41.     Based on the forgoing, I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to search for and seize the items described in Attachment B.

I, Erika Broadhurst, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,


/s/ Erika T. Broadhurst_____
Erika T. Broadhurst
HHS/OIG Special Agent


SWORN TO AND SUBSCRIBED TO
BEFORE ME THIS _11_ TH DAY OF MAY, 2018


_____    /s/ Daniel J. Lynch_____
DANIEL J. LYNCH
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF NEW HAMPSHIRE

**ATTACHMENT A**
**Property to be Searched**

The property to be searched is an Apple iPhone model A1660 cellular phone, bearing

FCC ID BCG-E3085A (the "Device").  The Device was seized from J. MASTROGIOVANNI on

May 10, 2018, and taken into custody of the U.S. Department of Health and Human Services,

Office of Inspector General.  It is currently being held in evidence in the secure evidence room of

the U.S. Attorney's Office at 53 Pleasant Street, Concord, New Hampshire.

**ATTACHMENT B**
**Items to Be Seized**

The following materials, which constitute evidence of the commission of a criminal

offense, contraband, the fruits of crime, or property designed or intended for use or which is or

has been used as the means of committing a criminal offense, namely violations of 18 U.S.C.

§ 1347 and 21 U.S.C. § 843(a)(3) including:

1.      All evidence relating to any prescriptions for either controlled or non-

controlled substances issued to Jane Mastrogiovanni

2.      Any forged prescriptions for controlled substances regardless of recipient

3.      Any blank prescriptions or prescription pads, regardless of provider

4.      Any records relating to Dr. S. Katragadda or NP D. Johnson

5.      All records related to the payment for prescriptions for either controlled or

non-controlled substances.

6.      All communications related to acquiring or obtaining controlled substances by

misrepresentations, fraud, forgery, deception or subterfuge.

7.      All evidence relating to the sale, distribution, diversion or other disposition of

any controlled substances.

8.      Evidence of user attribution showing who used or owned the Device at the

time the things described in this warrant were created, edited, or deleted, such as logs,

phonebooks, saved usernames and passwords, documents, and browsing history.

9.      As used above, the terms "records" and "information" include all of the

foregoing items of evidence in whatever form and by whatever means they may have been

created or stored, including any form of computer or electronic storage (such as hard disks or

other media that can store data); any handmade form (such as writing, drawing, painting); any

mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).